**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>**CHERISHED LAND, LLC,**<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 25-20220 |

**DEBTOR CHERISHED LAND, LLC'S OPPOSITION**
**TO MOTION TO DISMISS CASE**

Cherished Land, LLC, the above-captioned debtor and debtor-in-possession (the "**Debtor**"), hereby objects to and opposes (this "**Opposition**") the Motion to Dismiss [Dkt No. 32] (the "**Motion**"), filed by David Lyon ("**Lyon**") and James L. Belt ("**Belt**" and, together with Lyon, the "**Movants**"). In support of this Opposition, the Debtor states as follows:

**PRELIMINARY STATEMENT**

1.  The Debtor is a single asset real estate business formed around the rental income derived from its tenants. Like all bankruptcy petitioners, the Debtor experienced financial distress preceding the filing of its chapter 11 petition on the Petition Date (defined below), including the threat of foreclosure. This is not a secret; nor is it unusual. But contrary to the baseless suggestions of the Movants—who, through the Motion, attempt to distort the facts and misconstrue the standard for determining a "bad faith" filing (to the extent "bad faith" is a legally cognizable basis to dismiss a chapter 11 case in the first place) under § 1112(b) of the United States Bankruptcy Code ("**Bankruptcy Code**"), La Trinidad Elderly LP SE, 627 B.R. 779 (B.A.P. 1st Cir. 2021), and other cases—the Debtor did not file for bankruptcy merely to forestall a foreclosure (although,

---

[1] The last four digits of Cherished Land, LLC's federal taxpayer identification number are 0919, and its principal place of business is 64 Auburn Street, Portland, Maine 04103.

if it did, so what?), but rather to reorganize its liabilities, maximize the value of its assets, return to profitability, and repay its creditors in full. This Court need not look any further than the Debtor's immediately forthcoming DS and Plan (defined below) as proof of the Debtor's legitimate—and entirely feasible—goals for this case.

2. Indeed, the Debtor submits that Movants' retreat to "bad faith" for dismissal is better viewed as a concession that Movants have no legitimate basis to oppose the filing or existence of this case, thus resorting to the always amorphous and often problematic "bad faith" argument. Movants' desire to dismiss this case is especially eyebrow-raising here, where Movants assigned their voting rights prepetition, are minority equity holders in the Debtor, and stand to **benefit** from the preservation of value if the Debtor's reorganization is successful. The Motion, therefore, raises serious questions about Movants' true motivations and compliance with their own fiduciary duties by seeking a value-destructive foreclosure, rather than a **value-maximizing** reorganization.[2] But for the same reasons that even considering "good faith" or "bad faith" under § 1112(b) is a highly subjective and dangerous slippery slope—and an argument that nearly always fails as demonstrated by numerous recent denials of similar motions in this jurisdiction—this Court need not dwell on the Movants' true motivations for long. That is because the Motion is legally and factually without merit, and should be denied by this Court as such.

## JURISDICTION AND VENUE

3. This Court possesses Constitutional authority to issue final orders and judgments in this contested matter.

---

[2] For example, are Movants hoping to liquidate the Debtor's assets sooner at a reduced foreclosure price to satisfy their personal liabilities? As beneficiaries of the reorganization, it is hard to fathom another reason for desiring a value-minimizing outcome. Indeed, the Debtor understands that AVCOG (defined below) has sued Belt and Lyon as guarantors, so perhaps the Motion is intended to force a liquidation in the hope of paying off some of that AVCOG debt in the guarantor litigation. There may be other litigation of which the Debtor is unaware.

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), and this is a statutorily core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

5. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

A. **History of the Debtor and its Major Liabilities.**

6. On December 16, 2022, Samuel Eakin ("**Eakin**") filed a certificate of formation with the Secretary of State of the State of Maine establishing the Debtor as a member-managed limited liability company with an effective date of December 31, 2022.

7. On January 1, 2023, Eakin, as president of Cherished Possessions, Inc. ("**CPI**"), and the Movants executed an operating agreement (the "**Operating Agreement**") describing the purpose of the Debtor as real estate holding and listing the principal office of the Debtor as 64 Auburn Street, Portland, Maine (the "**Property**").

8. The Operating Agreement established a 25% membership interest for each of Belt and Lyon, and a 50% membership interest held by CPI (and, thus, controlled by Eakin).

9. On May 12, 2023, the Debtor executed and delivered to Franklin Savings Bank ("**FSB**") a promissory note ("**FSB Note**") in the original principal amount of **$719,000.00**. The FSB Note is secured by a mortgage granted by the Debtor on the Property.

10. On May 12, 2023, the Debtor executed and delivered to Finance Authority of Maine ("**FAME**") a promissory note ("**FAME Note**") in the original principal amount of **$350,000.00**. The FAME Note is secured by a mortgage granted by the Debtor on the Property.

11. On May 16, 2023, the Debtor executed and delivered to Androscoggin Valley Council of Governments ("**AVCOG**") a promissory note ("**AVCOG Note**") in the original principal amount of **$50,000.00**. The AVCOG Note purports to be secured by a mortgage granted

by the Debtor, but no mortgage was recorded in the Cumberland County Registry of Deeds.

**B.     The Chapter 11 Case and Scheduled Claims.**

12.    On September 11, 2025 (the "**Petition Date**"), the Debtor commenced this voluntary proceeding under Chapter 11 of the Bankruptcy Code.

13.    On September 25, 2025, the Debtor filed its Schedules and Statement of Financial Affairs. [Dkt. No. 14].

14.    On its Schedule A/B, the Debtor listed the Property at a fair market value of **$1,500,000.00**, accounts receivable in the amount of **$82,800.00** (comprised of unpaid rent[3]), and minimal cash. See Schedule A/B [Dkt. No. 14].

15.    The Debtor scheduled four (4) secured claims on Schedule D, each secured by the Property, which were the following: (a) City of Portland (Property Taxes) - **$18,000.00**; (b) City of Portland (Storm Water) - **$2,064.00**; (c) FAME Note - **$390,000.00**; and (d) FSB Note - **$825,210.00**.

16.    In addition, the Debtor scheduled multiple general unsecured claims, including the following: (a) CP Westbrook, LLC ("**CPW**") - **$300,000.00**; (b) Cross Insurance - **$5,439.43.00**; and (c) H&R Block - **$690.00**.

17.    On October 7, 2025, the Internal Revenue Service ("**IRS**") filed proof of claim # 1 in the amount of **$18,829.96**, including a priority claim for **$1,500.00**.

18.    On October 20, 2025, AVCOG filed proof of claim # 2 asserting a secured claim of **$53,298.55**.[4]

19.    Since the Petition Date, the Debtor has continued to receive rental income and

---

[3] This rent is owed by a business managed by Belt.
[4] Because AVCOG did not record a mortgage with the registry of deeds in connection its loan to the Debtor, the Debtor submits that the AVCOG lien was unperfected and, therefore, will only be allowed as an unsecured claim in this case.

4

accumulate cash, including approximately **$11,000.00** as of the end of October 2025.[5] [See October Operating Report, Dkt. No. 37]. Also since the Petition Date, the Debtor has entered into a new lease agreement with a commercial restaurant tenant—the Shaking Crab—which has agreed to pay additional rent to the Debtor each month and make meaningful renovations to the Property. The Debtor continues to pursue additional rental income and other opportunities to expand the Properties and increase revenue for the benefit of all stakeholders.

20. The Debtor anticipates filing a disclosure statement and plan of reorganization on or before December 10, 2025 (the "**DS and Plan**"). As will be reflected in the DS and Plan, the Debtor projects to have ample revenue to service its restructured liabilities and maintain the Property (including through multiple triple-net leases). The DS and Plan, moreover, will propose to pay all creditors—secured and unsecured—in full, with interest. On the other hand, the Debtor believes that an immediate liquidation of the Property, especially through a foreclosure auction in the middle of winter in Maine, would result in a materially lower value for the Property and would not pay creditors in full—or anywhere close to it.

C. **The Prepetition Assignment of the Movants' Voting Rights.**

21. Prior to the Petition Date, as noted above, Belt and Lyon each held 25% membership interests in the Debtor, with CPI holding the remaining 50% membership interest. Around May 2023, CPI facilitated the Debtor's acquisition of the Property from CPW. To finance its acquisition, the Debtor executed a promissory note with CPW in the original principal amount of **$300,000.00** and a mortgage deed against the property. As further security and consideration, CPW also received assignment of voting control, including a tie breaking vote, from Belt and Lyon, until the CPW note was paid in full. The CPW note remains outstanding. Accordingly,

---

[5] The forthcoming November Operating Report will reflect that the Debtor's cash balance has improved to approximately $15,000.00.

before the Petition Date, Belt and Lyon assigned their voting rights to CPW, including as to any matter in which a tie breaking vote was required under the Debtor's operating agreement.[6]

## LEGAL STANDARD

22. Section 1112(b) governs conversion or dismissal of a chapter 11 case. Section 1112(b)(1) provides, in pertinent part, as follows:

> (1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

23. Section 1112(b)(1) "invokes a two-step analysis, first, to determine whether 'cause' exists either to dismiss or to convert the chapter 11 proceeding to a chapter 7 proceeding, and second to determine which option is in the best interest of creditors and the estate." In re Costa Bonita Beach Resort, Inc., 513 B.R. 184, 200 (Bankr. D.P.R. 2014) (quoting Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.), 14 F.3d 240, 242 (4th Cir. 1994), and citing In re Mech. Maint., Inc., 128 B.R. 382, 386 (E.D. Pa. 1991)).

24. "The initial burden is on the movant to prove there is cause for either conversion or dismissal of the chapter 11 case." Andover Covered Bridge, LLC, 553 B.R. 162, 171 (B.A.P. 1st Cir. 2016) (citing Efron v. Candelario (In re Efron), 529 B.R. 396, 411 (1st Cir. BAP 2015)). "Once the movant establishes cause, the burden shifts to the opposing party to demonstrate 'unusual circumstances' establishing that conversion or dismissal is not in the best interests of

---

[6] Movants have admitted to this assignment of their voting rights in the state court litigation with AVCOG and, therefore, are estopped from taking a different position in this case. See *Defendants Lyon and Belt's Joint Objection to Motion for Attachment and Attachment on Trustee Process with Incorporated Memorandum of Law*, a true and correct copy of which is attached hereto as **Exhibit A**.

creditors and the estate, and that it meets the other requirements of § 1112(b)(2)." Id. at 172. "If no such unusual circumstances exist and/or the other requirements are not met, the bankruptcy court must convert or dismiss the case." Id. at 172 (emphasis omitted). "The bankruptcy court has broad discretion to determine whether unusual circumstances exist and whether conversion or dismissal is in the best interest of creditors and the estate." Id. at 172.

25. Although the Bankruptcy Code does not define "cause" as used in § 1112(b), § 1112(b)(4) provides a nonexclusive list of what constitutes cause.[7] Section 1112(b) does **not** list bad faith, or lack of good faith, among the factors providing grounds for dismissal. However, that statute is not exhaustive, and many courts within the First Circuit (including the Bankruptcy Appellate Panel ("**BAP**") and this Court) have indicated (in non-binding precedent) that "bad faith" may be cause under § 1112(b). Assuming that this Court maintains that view—and with a full reservation of rights about whether "bad faith" is a legally cognizable form of "cause" under § 1112(b)—these cases provide guidance on how courts should go about the highly subjective separation of "good" or "worthy" chapter 11 cases from "bad" or "unworthy" chapter 11 cases.

26. In particular, the First Circuit BAP in La Trinidad Elderly LP SE, 627 B.R. 779 (B.A.P. 1st Cir. 2021), looked to guidance from the First Circuit's adjacent case law and stated as follows:

> The First Circuit has observed that courts that recognize a good faith requirement "impose a prima facie burden on the party seeking dismissal to demonstrate that the debtor filed the petition in bad faith." OneUnited Bank, 501 B.R. at 7-8 (citing In re Capitol Food Corp. of Fields Corner, 490 F.3d at 24). "Although the First Circuit did not delineate the contours of the prima facie burden placed upon the entity seeking dismissal of the petition, it intimated that petitions filed in response to 'catastrophic business events,' such as imminent foreclosures, are typically filed in good faith." Id. at 8 (quoting In re Capitol Food Corp. of Fields Corner, 490

---

[7] Because Movants only rely on "bad faith" for cause, the Debtor does not delve into the examples of cause actually enumerated by Congress. The Debtor submits that Movants' failure to rely on, for example, "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," is a tacit admission that the Debtor is preserving (and increasing) the value of the estate and that the Debtor is likely to rehabilitate.

7

> F.3d at 25). "Similarly, the First Circuit noted that merely evincing the debtor's desire to 'frustrate creditors' does not alone demonstrate 'bad faith' because the Code recognizes the need for a 'breathing spell' as a proper purpose to file a petition." Id. (quoting In re Capitol Food Corp. of Fields Corner, 490 F.3d at 25). Still, "an entity may not file a petition for reorganization which is solely designed to attack a judgment collaterally—the debtor must have some intention of reorganizing." C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship), 113 F.3d 1304, 1310 (2d Cir. 1997) (citation omitted) (internal quotation marks omitted).

Id. at 799.

27. Building from this First Circuit case law, the BAP, in La Trinidad, went on to state that "courts have concluded that the good faith determination involves a fact-intensive inquiry," id. at 800, and the BAP then suggested eight factors that courts may consider when performing this inquiry:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two[-]party dispute between the debtor and secured creditors which can be resolved in the pending state court foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor cannot meet current expenses, including the payment of personal property and real estate taxes; (8) the debtor has no employees.

Id. at 800. The BAP concluded by cautioning that "determining whether a debtor has filed a petition not in good faith requires looking at the totality of the circumstances." Id. (cleaned up).

## **OBJECTION**

28. Assuming for purposes of this Opposition that "bad faith" is a legally recognized form of cause under § 1112(b), the Debtor submits that, for the reasons below, Movants come nowhere close to meeting their burden. Further, as the facts, evidence, and DS and Plan will reflect, the Debtor filed this case to **preserve** the going-concern value of its assets, to **maximize** that value for the benefit of all stakeholders, and to **reorganize** its liabilities through chapter 11.

8

Rather than making this a "bad" chapter 11 case warranting dismissal, these are well-accepted (and admirable) reasons for filing a chapter 11 petition. See In re Gonic Realty Trust, 909 F.2d 624, 267 (1st Cir. 1990) ("The purpose of the Bankruptcy Code is essentially to encourage financial restructuring and payments to creditors while preserving jobs and shareholder interest"). Thus, whatever the Movants' personal motivations may be for desiring dismissal, the Motion fails on all fronts, and this Court should deny the Motion. Finally, given that Movants assigned their voting rights as to the Debtor, this Court should find that the Movants lack the right to file the Motion and challenge the chapter 11 filing, as doing so is nothing more than an impermissible effort to unwind that assignment by dictating—under the guise of "bad faith"—the Debtor's ability to remain in chapter 11.

A.  **The Debtor Filed for Chapter 11 in Good Faith to Reorganize its Liabilities and Maximize the Value of its Assets to the Benefit of All Stakeholders, Including the Movants.**

29. For the reasons set forth below, the La Trinidad factors, combined with basic bankruptcy policy and the totality of the circumstances, establish that this case was not filed in bad faith. Accordingly, this Court should deny the Motion because the Movants cannot establish "cause."

30. **Whether the debtor only has one asset**. The Debtor's assets include real estate, accounts receivable, and cash. However, although it is true that the Debtor's core asset (from which the cash and receivables are derived) is its real estate, the Debtor submits that this factor should be granted little to no weight in the equation. Specifically, given that Congress explicitly permits single asset real estate debtors to file for chapter 11 **and** legislated special protections for creditors in single asset real estate cases—e.g., to avoid stay relief, § 362(d)(3) of the Bankruptcy Code requires a single asset real estate debtor, within 90 days after filing bankruptcy, to file a plan

9

that has a reasonable possibility of being confirmed or commence regular payments to the secured creditor at the non-default interest rate—the expanded use of "bad faith" and apparent heightened scrutiny in these cases on single asset debtors is perplexing and, seemingly, contrary to legislative intent. Had Congress, for example, intended to impose a "bad faith" standard or heightened gatekeeping requirement for single asset real estate debtors (such as suggesting that having a single asset is even a relevant factor, as in La Trinidad), Congress could have done so. The fact that it chose not to indicates that courts should proceed with extreme caution in treating debtors with a single real estate asset any differently under § 1112(b). (For further proof, Congress knew enough about single asset real estate debtors to exclude them from Subchapter V eligiblity (see 11 U.S.C. § 101(51D) (excluding a person whose primary activity is the business of owning single asset real estate); Congress did not do so for chapter 11 as a whole.) Accordingly, although this factor describes the Debtor, this Court should give it little to no weight in the calculus. See In re Costa Bonita Beach Resort, Inc., 479 B.R. 14, 41 (Bankr. D.P.R. 2012) ("The fact that the Debtor is a [single asset real estate] case is not by itself an indicia of a bad faith filing.").

31. **Whether the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors.** The Debtor scheduled secured claims of three different creditors totaling **$1,235,274.87** and five unsecured creditors. In addition, AVCOG filed a proof of claim (which is an unsecured claim for reasons stated above) in the amount of **$53,298.55**, and the IRS filed an unsecured claim in the amount of **$18,829.96**. Thus, even setting aside the insider claim of CP Westbrook—which, the Debtor submits, there is no legal basis to ignore for this analysis—the unsecured claims against the Debtor remain substantial and varied. This is not, therefore, a case with a debtor and one creditor, but rather a case with multiple creditors holding various claims and lien rights arising at different times for different reasons. This factor, therefore,

10

supports denying the Motion.

32. **Whether the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt.** Prior to the Petition Date, the Property was subject to foreclosure by FSB. This factor, however, cannot be analyzed in isolation. See In re PM Cross, LLC, 494 B.R. at 618 ("Determining bad faith … requires a difficult distinction between permissible and impermissible motives. … This is especially true in single asset real estate cases, where many of the factors can be present – even in the absence of bad faith"); In re Capitol Food Corp. of Fields Corner, 490 F.3d 21, 25-26 (1st Cir. 2007) (noting chapter 11 petition intended to provide "breathing spell" from foreclosure actions). As this Court knows, financial difficulties almost always precede bankruptcy petitions, and this Debtor is no different. See In re Kevin B. Dean, Ch. 11, Case No. 20-20427 (Order Denying Motion to Dismiss for bad faith filing under 11 U.S.C. § 1112(b) (D.E. 73) ("Many debtors seek protection under title 11 in response to creditor enforcement actions. That is neither atypical nor inappropriate"). The mere presence of an impending foreclosure does not support a finding of bad faith, or else the cases of virtually all single asset petitioners (and many other debtors) would be subject to dismissal. See In re Capitol Food, 490 F.3d at 25 ("Catastrophic business events, such as an imminent or threatened foreclosure on the debtor's interests in real property essential to successful reorganization efforts, are precisely the sort of imminent financial distress for which debtors routinely seek chapter 11 protection."). Thus, to give any weight to this factor is contrary to bankruptcy policy, as well as the fact that Congress already created other protections for lenders in these cases.

33. **Whether the debtor's financial condition is, in essence, a two-party dispute between the debtor and secured creditors which can be resolved in the pending state court foreclosure action.** This is not a two-party dispute. There are more than seven creditors with

claims against the Debtor, excluding insiders. In addition, the Movants constitute two additional parties who apparently now are part of the disputes in this case. As the DS and Plan will reflect, the Debtor is attempting to reorganize **all** of its debts, not just the FSB Note. In arguing that this case is a two-party dispute, the Movants emphasize that FSB was poised to begin foreclosure proceedings at the time the Debtor filed for bankruptcy. But impending foreclosure is a common theme among many bankruptcy petitioners and, therefore, is not a magic wand that makes all other creditors disappear. Further, the Debtor has not maneuvered in such a way as to minimize the impact of all but one secured claim on its Property. Both FAME and the City of Portland retain secured claims that encumber the Property, and the Debtor will seek to restructure those liabilities as well. Thus, this factor favors the Debtor.

34. **Whether the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.** The mere possibility, or even likelihood, of a foreclosure action cannot be said to satisfy this factor, because nearly all bankruptcy petitions are made under financial distress, and many are made on the eve of foreclosure. See In re Capitol Food, 490 F.3d at 25. It is a debtor's Constitutional right to seek protection under bankruptcy laws. This case, moreover, can be easily distinguished from cases where the factor did support dismissal. For example, in In re PM Cross, LLC, the facts supported an inference that the debtor instructed his attorney to file a bankruptcy proceeding while observing an ongoing foreclosure auction. The timing of that petition—apparently made as a result of the outcome of the auction—indicated that the filing was not made out of financial distress, but instead to frustrate the outcome of the auction. Here, in contrast, the Debtor is not trying to frustrate its creditors' rights but rather to maximize value of its assets so one creditor is not favored over others, and all creditors are paid in full. Accordingly, this factor favors the Debtor.

35. **Whether the debtor has little or no cash flow.** Although the Debtor's cash flow slowed in 2025, giving rise to its financial difficulties and this case, the Debtor is already reestablishing its cash flow and improving its revenue through additional tenants, including the new restaurant tenant. This cash flow, moreover, will be sufficient in relation to the Debtor's restructured liabilities and other expenses, including as additional revenue sources are identified over time. As such, it is not true that this Debtor has "little or no cash flow," but rather the cash is flowing and only improving. This factor, therefore, supports the Debtor.

36. **Whether the debtor cannot meet current expenses, including the payment of personal property and real estate taxes.** Like many debtors, this Debtor experienced financial distress in the preceding years and accrued certain amounts of prepetition taxes. As the DS and Plan will reflect, however, the Debtor projects sufficient revenue to both repay prepetition taxes and stay current postpetition (and post-confirmation). Indeed, the Bankruptcy Code explicitly permits debtors to confirm a plan while repaying prepetition taxes over a finite period of time, see 11 U.S.C. § 1129(a)(9), and that is exactly what this Debtor can and will do. Thus, it is debatable whether this factor should have any weight given it conflicts with other provisions of the Bankruptcy Code and rights granted therein to chapter 11 debtors. But, to the extent any such weight is afforded, the factor favors the Debtor.

37. **Whether the debtor has no employees.** It is unclear why this factor is relevant to the "bad faith" determination or what the presence of employees indicates about a debtor's ability to reorganize (especially for a single asset real estate debtor that does not need employees and rarely will have any). Thus, although this Debtor does not have any employees, the Debtor submits that this factor should be given little to no weight here.

\* \* \*

38.    For the reasons set forth above, and additional evidence to be introduced by the Debtor as needed at a contested evidentiary hearing, the La Trinidad factors do not support dismissal of this case.  Indeed, at the heart of La Trinidad and other "bad faith" cases is an effort by courts to sort the wheat from the chaff in terms of chapter 11 cases that are likely to succeed and those that are merely delaying the inevitable.  Here, the totality of the circumstances establish that this Debtor filed this case in good faith, is meeting its obligations as a debtor-in-possession, and, as the DS and Plan will show, is likely to reorganize in a value-maximizing chapter 11 case that pays creditors in full and preserves existing equity in the assets.  Thus, rather than "bad faith," this case was filed to benefit from the Bankruptcy Code exactly as intended and is no different than other chapter 11 cases filed every day.  The Motion should be denied because the Movants failed to establish "cause."

**B.     This Court Should Determine that Movants Are Prohibited from Challenging the Chapter 11 Filing Due to Their Voluntary Assignment of Voting Rights as Members of the Debtor.**

39.    As set forth above, Belt and Lyon assigned their voting control as members of the Debtor, including as to any tie breaking vote.  This assignment is reflected in the Debtor's chapter 11 authorizing resolution [Dkt. No 1 at p.5], and it has been acknowledged in other court proceedings by Belt and Lyon to defend themselves against personal liability.  It is inherent in surrendering that voting control to CPW that Belt and Lyon **also** surrendered the right to control whether, and when, the Debtor might file a chapter 11 petition, along with any other decisions that the Debtor may make for which a member vote is required.  Thus, the Motion is nothing more than an attempt to sidestep that assignment by seeking dismissal of the filing on "bad faith" grounds— that is, on the basis that Eakin and CPW did not authorize the filing for the "right" reasons. Accordingly, to afford the assignment by Belt and Lyon its full force and obvious intent, this Court

14

should conclude that Movants lack standing or otherwise have assigned away any right to challenge the existence of this case. The Motion should be denied on this basis as well.

## RESPONSES TO FACTUAL ALLEGATIONS

40. The Debtor admits the statement contained in ¶ 1 of the Motion.

41. The Debtor admits the statement contained in ¶ 2 of the Motion.

42. The Debtor admits the statement contained in ¶ 3 of the Motion.

43. The Debtor admits the statement contained in ¶ 4 of the Motion.

44. The Debtor admits the statement contained in ¶ 5 of the Motion.

45. The Debtor admits the statement contained in ¶ 6 of the Motion.

46. The Debtor admits the statement contained in ¶ 7 of the Motion.

47. The Debtor denies the statement contained in ¶ 8 of the Motion based on lack of information and belief.

48. The Debtor denies the statement contained in ¶ 9 of the Motion based on lack of information and belief.

49. The Debtor denies the statement contained in ¶ 10 of the Motion based on lack of information and belief.

50. The Debtor denies the statement contained in ¶ 11 of the Motion based on lack of information and belief.

51. The Debtor admits the statement contained in ¶ 12 of the Motion.

52. The Debtor admits the statement contained in ¶ 13 of the Motion.

53. The Debtor admits the statement contained in ¶ 14 of the Motion.

54. The Debtor admits the statement contained in ¶ 15 of the Motion.

55. The Debtor admits the statement contained in ¶ 16 of the Motion.

56. The Debtor admits the statement contained in ¶ 17 of the Motion.

57. The Debtor admits the statement contained in ¶ 18 of the Motion.

## **CONCLUSION**

WHEREFORE, the Debtor submits that this Court should: (i) deny the Motion; and (ii) grant such other and further relief as may be just and equitable under the circumstances.

Dated:   December 8, 2025

Respectfully submitted,
**BERNSTEIN, SHUR, SAWYER & NELSON, P.A.**

*/s/ Sam Anderson*
D. Sam Anderson, Esq.
Adam R. Prescott, Esq.
100 Middle Street
PO Box 9729
Portland, Maine 04104
Telephone: (207) 774-1200
Facsimile: (207) 774-1127
sanderson@bernsteinshur.com
aprescott@bernsteinshur.com

*Counsel to the Debtor and Debtor-in-Possession*